IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

No. 4:11-CV-00037-D

McDONALD CONYERS,                    )
                                     )
            Plaintiff,               )
                                     )
      v.                             )          **MEMORANDUM AND**
                                     )          **RECOMMENDATION**
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
            Defendant.               )

      This matter is before the Court on the parties' cross motions for judgment on the pleadings.

Claimant, McDonald Conyers, seeks judicial review of the Commissioner's denial of his application

for Social Security Disability and Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI"). After a thorough review of the record and consideration of the briefs submitted by

counsel, it is recommended that Claimant's motion for judgment on the pleadings [DE-38] be

granted, that the Commissioner's motion for judgment on the pleadings [DE-43] be denied, and that

the case be remanded to the Commissioner for further proceedings consistent with this Memorandum

and Recommendation.

## STATEMENT OF THE CASE

      Claimant protectively filed initial applications for DIB and SSI on November 13, 2007. (R.

87, 133-136, 224-233.)    He alleged disability beginning October 20, 2007 due to high blood

pressure, swelling of the legs, dizzy spells, back problems, arthritis, and diabetes. (R. 297.) These

applications were denied initially (R. 155-60) and upon reconsideration (R. 161-69). Claimant then

requested a hearing before an Administrative Law Judge ("ALJ") (R. 174-75), which took place on

January 13, 2010 (R. 104-28). On March 9, 2010, the ALJ issued a decision denying Claimant's application in its entirety. (R. 84-103.) The Appeals Council denied Claimant's request for review on December 15, 2010 (R. 1-5), which rendered the ALJ's decision a "final decision" for purposes of judicial review. *See Walls v. Barnhart*, 296 F.3d 287, 289 (4th Cir. 2002) (noting that when the Appeals Council denies a request for review, the underlying decision by the ALJ becomes the agency's final decision for purposes of appeal). Claimant then commenced this action pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

### I. Standard of review

The scope of judicial review of a final decision regarding DIB and SSI under the Social Security Act is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *Walls*, 296 F.3d at 290; 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). This Court must not weigh the evidence, as it lacks the authority to substitute its judgment for that of the Commissioner. *Walls*, 296 F.3d at 290. Rather, when conflicting evidence is presented, it is up to the ALJ to resolve those inconsistencies and not the responsibility of the Court to determine the weight of the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In determining whether substantial evidence supports the Commissioner's decision, the Court's review is limited to whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his or her findings and rationale in crediting the evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

2

## II.    The Social Security framework

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process to be followed in a disability case. 20 C.F.R. §§ 404.1520, 416.920. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. If the claimant is not engaged in substantial gainful activity, then at step two the Commissioner must determine whether the claimant has a severe impairment or combination of impairments which significantly limit his or her ability to perform basic work activities. If no severe impairment is found, the claim is denied. If the claimant has any severe impairments, at step three the Commissioner determines whether any of the claimant's impairments meet or medically equal the requirements of one of the Listings of Impairments ("Listings"), as listed in 20 C.F.R. § 404, Subpart P, App. 1. If any impairments meet or equal a Listing, the person is disabled *per se*. If no impairments meet or equal a Listing, at step four the claimant's Residual Functional Capacity ("RFC") is assessed to determine if the claimant can perform his or her past work despite his or her impairment(s). If so, the claim is denied. If the claimant cannot perform his or her past relevant work, at step five the burden shifts to the Commissioner to show that the claimant, based on his or her age, education, work experience and RFC, can perform other substantial gainful work.

## III.    The ALJ's findings

Here, the ALJ proceeded through the five-step sequential evaluation process as set forth in 20 C.F.R. §§ 404.1520, 416.920. First, at step one, the ALJ found that Claimant had not engaged in substantial gainful activity since October 20, 2007, the alleged onset date. (R. 89.) Next, at step two, the ALJ found that Claimant suffered from the severe impairments of high blood pressure, history of transient cerebral ischemia attacks, degenerative disc disease, obesity, and borderline

3

intellectual functioning. *Id.* However, at step three, the ALJ determined that Claimant's impairments did not meet or medically equal a Listing. (R. 90-91.) Instead, at step four, the ALJ determined that Claimant retained the RFC to perform medium work, except that he would need to avoid concentrated exposure to hazards such as machinery and heights. (R. 91.) Finally, at step five, the ALJ determined that there are other jobs that exist in significant numbers in the national economy that Claimant could perform. (R. 97.) As a result, the ALJ found that Claimant was not disabled. (R. 98.)

## IV.    The January 13, 2010 administrative hearing

### a.    Claimant's testimony at the administrative hearing

Claimant testified to the following at the January 13, 2010 administrative hearing held in conjunction with his applications for DIB and SSI. (R. 108-24.) At the time of the hearing, he was living in "Rocky Mountain [sic], North Carolina" with his parents because he had lost his house in 2007. (R. 109, 123.) He had a fourth grade education and was able to read and write only "very little." (R. 109.) To that end, he was able to read and write his name, but could not, for example, fill out paperwork sent to him by his attorney regarding his case and had to have written test questions read to him when applying for a driver's license. (R. 109, 114.) However, he was able to add up money and pay his own bills. (R. 110.)

Claimant had not worked since the end of 2007, at which time he had been driving a construction truck that hauled asphalt, sand, rocks, etc. *Id.* In addition to driving the truck, as a part of this job he had to "get inside and clean the asphalt out." *Id.* Claimant testified that he had been driving construction trucks for approximately 28 years, for which he had a class D commercial driver's license. (R. 114.) However, Claimant's attorney indicated in her questions to Claimant that

4

Claimant had actually only held truck driving jobs for about seven years. *Id.* Prior to the truck driving jobs, Claimant worked in the textile industry for 12 years running a machine which made window blinds. *Id.* The machine had a "real heavy bar" weighing approximately 80 pounds and "rows on the ground," and Claimant had to slide the bar through the rows and then "pop it" to cut them. (R. 115.) Prior to the window blind machine job, Claimant worked on a farm for 15 or 16 years. *Id.* Claimant also testified that he drew unemployment in 2008 and 2009. (R. 111-13.)

Claimant testified that he stopped working "[b]ecause [his] back was bothering [him] so bad and [he] started having the mini-strokes." (R. 115.) Claimant indicated that the back pain was in the lower part of his back and that it sometimes it went "down [his] leg" (R. 117) and that the mini-strokes had started in 2007, lasted 20-30 minutes, caused his left side to go numb, and felt like "little pins sticking in the bottom of your feet" (R. 121, 123). He testified that he had been hospitalized for the mini-strokes, including one time when he was kept in the hospital for three days after passing out in a Wal-Mart. *Id.* In addition, he testified that he suffered from high blood pressure and diabetes. (R. 116.)

At the time that he stopped working, Claimant did not have any type of health insurance, but he got his medicines through the help of family members. *Id.* However, at the time of the hearing, he was receiving Medicaid benefits and could get all of his medicines. *Id.* Claimant also testified that he had been suffering from kidney stones, had undergone five surgeries to remove them between September 2009 and the time of the hearing, and that he had been unable to do anything about his back by the time of the hearing because of these surgeries. (R. 116-17.)

With regard to his limitations, Claimant testified that the pain in his back prevented him from exercising, picking up anything over twenty pounds, or walking around a store for more than five

5

minutes. (R. 118-19.) He testified that he did what he could to help his parents out around the house, but that he wasn't able to do much. (R. 119.) For example, he indicated that he was able to cook a little bit, except that he could only stand at the stove for two or three minutes at a time. (R. 120.) However, he was not able to unload groceries or assist his immobile father with getting up. (R. 119-20.)

### b. Vocational expert's testimony at the administrative hearing

Stephen Carpenter, a vocational expert ("VE"), also testified at the administrative hearing. (R. 124-27.) Mr. Carpenter stated that Claimant had performed the following past work: (1) machine feeder, any industry, DOT code 699.686-010, medium physical requirements, unskilled, SVP 2; and (2) dump truck driver, any industry, DOT code 902.683-010, medium physical requirements, unskilled, SVP 2. (R. 125.) The ALJ then posed the following hypothetical to Mr. Carpenter:

> [A]ssume an individual who is closely approaching advanced age, who is functionally illiterate, and has the claimant's past relevant work experience. Assume further that the individual could lift and carry up to 50 pounds occasionally, 25 pounds frequently. The individual should avoid concentrated exposure to hazards. The individual can sit, stand, and walk at least six hours each during a typical eight-hour workday, and the individual can do simple, routine, repetitive work tasks. Would that individual be able to perform the claimant's past relevant work?

(R. 126.) Mr. Carpenter responded that such an individual could not perform Claimant's past relevant work because, though such an individual could otherwise perform the requirements, those jobs would require the prohibited exposure to hazards. *Id.*

The ALJ then asked Mr. Carpenter whether there would be any other jobs that the person could perform. *Id.* Mr. Carpenter responded that there would be, and gave three examples of jobs classified as medium physical requirements, unskilled, SVP 2: (1) day worker, domestic service industry, DOT code 301.687-014; (2) cleaner, hospital, medical service industry, DOT code 323.687-

6

010; and (3) laundry worker II, laundry and related industries, DOT code 361.685-018. (R. 126-27.)

Mr. Carpenter indicated that there were approximately 500,000 similar jobs nationally and multiple

thousands (at least 5,000) in North Carolina for each of these three jobs. *Id.*

## V. Claimant's argument on appeal

On appeal, Claimant make only one argument: that the ALJ erred by not finding that

Claimant met the requirements of Listing 12.05B. In response, the Commissioner argues that the

ALJ's decision that Claimant did not meet all of the requirements of Listing 12.05B was supported

by substantial evidence and should be affirmed.

Listing 12.05, Mental Retardation, reads as follows:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied:

A. Mental incapacity evidenced by dependence on others for personal needs (e.g., toileting, eating, dressing, or bathing) and an inability to follow directions, such that the use of standardized measures of functioning is precluded; or

B. A valid verbal, performance, or full scale IQ of 59 or less; or

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

  1. Marked restriction of activities of daily living; or
  2. Marked difficulties in maintaining social functioning; or
  3. Marked difficulties in maintaining concentration, persistence or pace;
  4. Repeated episodes of decompensation, each of extended duration.

7

20 C.F.R. § 404, Subpart P, App. 1, §12.05. Therefore, Listing 12.05B sets forth a two-part inquiry for determining mental retardation. First, a claimant must satisfy the diagnostic definition of mental retardation by showing that (s)he suffers from "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." Then, the claimant must meet the category B level of severity by showing that (s)he has a valid IQ of 59 or less.

Here, the ALJ found at step two of the sequential evaluation process that Claimant suffered from the severe impairment of borderline intellectual functioning (R. 89.) However, the ALJ found that Claimant had *not* established that he met the requirements of any of the sub-parts of Listing 12.05. (R. 91.) In so finding, the ALJ specifically considered Listing 12.05B, as well as Listing 12.05C, and found the following:

> The claimant's mental impairment has been considered under the requirements of listing 12.05. Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in paragraphs A, B, C, or D are satisfied. On May 4, 2004, WAIS-III testing indicated a verbal IQ of 59, a performance IQ of 53 and a full scale IQ of 52. The examiner felt the scores were valid. These scores would meet the requirement of 12.05 (B), which requires a valid, performance, or full scale IQ of 59 or less. Further, the requirements of 12.05 (C) are met, as the claimant has a low IQ and other impairments which limit him. However, the record does not establish deficits in adaptive functioning prior to the age of 22 as required by the Regulations. The claimant is independent in his activities of daily living. He has lived alone and independently, paying his own bills, preparing meals, and engaging in other self-care tasks. He has worked with good, steady earnings. The claimant has worked in the past driving trucks and passed a Department of Transportation physical related to his job. The claimant was married for 8 years and had three children. Accordingly, the undersigned finds the criteria of the listing is not met.

8

(R. 91.) These two paragraphs, along with the ALJ's brief mentions later in her opinion that Claimant was illiterate (R. 97) and that his "retained mental capabilities include[d] at the least: understanding, remembering and carrying out simple instructions; making judgments that are commensurate with the functions of unskilled work–i.e., simple work-related decisions; responding appropriately to supervision, coworkers and usual work situations; and dealing with changes in a routine work setting" (R. 91-92), constituted the entirety of the ALJ's discussion of Claimant's mental capacity.

Claimant argues that the ALJ erred in concluding that he failed to meet or medically equal Listing 12.05B because, although the ALJ found that Claimant had the necessary IQ score, the ALJ erred in finding that Claimant did not satisfy the diagnostic definition of mental retardation by showing that he had the requisite deficits in adaptive functioning initially manifested during the developmental period. In support of this position, Claimant points to the fact that the ALJ found that he was illiterate, the fact that he testified that he had only a fourth grade education, and the fact that in May 2004, a doctor opined that he was mentally retarded and unable to read or write beyond recognizing his name.

In response, the Commissioner argues that the ALJ did not err in finding that Claimant did not meet or medically equal Listing 12.05B because her decision was based on substantial evidence. To that end, although the Commissioner concedes that the ALJ found that Claimant had the requisite IQ score, the Commissioner argues that the ALJ's finding that Claimant did not have any *current* deficits in adaptive functioning and that, therefore, Claimant could not satisfy the diagnostic definition of mental retardation, as required by Listing 12.05B, was based on substantial evidence. The Commissioner points to a recent Fourth Circuit case, *Hancock v. Astrue*, 667 F.3d 470 (4th Cir.

9

2012), in support of the position that an ALJ's determination that a claimant does not have any current deficits in adaptive functioning is sufficient to preclude a finding that a claimant has satisfied the diagnostic definition of mental retardation, as required by Listing 12.05B. In so arguing, the Commissioner does note that the ALJ referred to Claimant's lack of "deficits in adaptive functioning prior to the age of 22," but contends that her rationale indicates that it was, in fact, Claimant's adult age deficits which she found to be lacking. In addition, the Commissioner points to Claimant's long work history, the fact that he adapted to several different jobs, and his ability to live independently, do some chores, and handle his own bills as further evidence that he did not satisfy the diagnostic definition of mental retardation. The Commissioner also argues that Claimant's illiteracy is not *per se* equal to an inability to adapt in functioning because, for example, Claimant was able to work several different jobs and obtain a commercial driver's license with the questions read to him despite his illiteracy.

At the outset, the Court finds that it is undisputed that Claimant has a valid IQ score of 59 or less. The ALJ found that Claimant had the requisite IQ score (R. 91) and the Commissioner concedes that Claimant was found to have a valid verbal IQ score of 59, performance IQ score of 53, and full scale IQ score of 52 in 2004, Comm.'s Mem. in Supp. of Mot. For J. on the Pleadings at 6 [DE-44]. Therefore, Claimant has clearly satisfied the requirements of the category B level of severity. However, even if the record clearly establishes that a claimant meets the level of severity requirement, a finding of mental retardation under Listing 12.05B cannot be warranted without a finding that the claimant satisfied the diagnostic definition of mental retardation. Accordingly, the

10

Court turns its attention to the question of whether the ALJ's finding that Claimant has not satisfied the diagnostic definition of mental retardation is supported by substantial evidence.

In determining whether substantial evidence supports the Commissioner's decision, the Court's review is limited to whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and rationale in crediting the evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. In this case, the Court finds that the ALJ did *not* properly analyze all of the relevant evidence in reaching the conclusion that Claimant did not satisfy the diagnostic definition of mental retardation, as required by Listing 12.05B. Therefore, the Court finds that the ALJ's decision is not supported by substantial evidence and that the case should be remanded in order to allow the Commissioner to properly address whether Claimant has satisfied the diagnostic definition of mental retardation, as required by Listing 12.05B. Furthermore, the Court finds that the Commissioner's proffered case, *Hancock*, does not dictate a different result.

        **i.     The ALJ did not properly analyze all of the relevant evidence in reaching the conclusion that Claimant did not satisfy the diagnostic definition of mental retardation, as required by Listing 12.05B.**

Here, the ALJ noted that Claimant had filed three prior applications for Social Security disability: two DIB applications on March 12, 2004 and December 5, 2006, respectively, and an SSI application on August 23, 2006. (R. 89.) However, the ALJ also noted that she was basing her current decision on only the evidence associated with Claimant's most recent applications for Social Security disability, a DIB application and an SSI application protectively filed on November 13, 2007, because the October 20, 2007 onset date alleged in those applications was later than the filing dates of all of the prior applications. (R. 89-90.) As a result, in her March 9, 2010 decision on the instant applications, the ALJ did not discuss in detail any evidence concerning Claimant's level of

11

adaptive functioning dating from the time period prior to his most recent Social Security disability applications.

The record in this case does not contain any evaluations of Claimant relating to his level of adaptive functioning which were performed in conjunction with his current applications for Social Security disability. However, the record does contain a Disability Determination Services ("DDS") evaluation performed in conjunction with Claimant's first application for DBI by psychologist Dr. Edward V. English, M.A. on May 4, 2004, which reads, in pertinent part, as follows:

> His intellectual functioning, therefore, as measured at this time falls within the lower limits of the mild mental retardation classification. According to the American Psychiatric Association classification system, individuals with IQs from approximately 50 up to 70 are classified within the mild MR range. There is not a significant difference in any of his three IQ levels and they all fall within the same category. There is a 95% Confidence Interval for his true Full Scale IQ score, and this is between 49 and 57. He applied himself and his scores are felt to be valid.

> On the Wide Range Achievement Test this client was able to read and recognize letters of the alphabet. He could also print letters of the alphabet when called off to him, however, he was not able to combine any of these letters to form words. For instance, the reading test begins with the word "In" and he could not read this nor any words of increasing difficulty. In fact, he could not pronounce these words and when he was asked to spell simple three-letter words such as "and" he was not able to do this. He therefore appears to be functionally illiterate.

> . . . .

> He went to the public school system in Edgecombe County, NC. He was in special education classes and could not learn and states he became discouraged and dropped out. He never learned to read nor write other than his own name and when he wrote this it was rather crude. However, it was recognizable as his name. . . . He obtains a Full Scale IQ score at this time of 52 and this is within the mild mental retardation classification and considerably low within that range.

12

(R. 339-40.) In the instant decision, the ALJ did acknowledge the existence of Dr. English's report insofar as it established that Claimant had the requisite IQ score to meet the Listing 12.05B level of severity requirement. However, the ALJ did not consider Dr. English's opinion to any further extent.

As this Court has noted, "evidence submitted in a prior proceeding 'still might reinforce or illuminate or fill gaps in the evidence developed for the second proceeding.'" *Yuengal v. Astrue*, No. 4:10-CV-42-FL, 2010 WL 5589102, at *9 (E.D.N.C. Dec. 17, 2010) (citations omitted). As a result, an ALJ "'is entitled to consider evidence from a prior denial for the limited purpose of reviewing the preliminary facts or cumulative medical history necessary to determine whether the claimant was disabled' without fear of this review amounting to a reconsideration on the merits and thereby constituting a de facto reopening of an earlier application." *Id.*; *see also, e.g.*, *Beth v. Astrue*, 494 F. Supp. 2d 979, 1006-07 (E.D.Wis. 2007) ("It is well-established that evidence from a prior application, even if not re-opened, can be relevant to a claim of disability with a later onset date. Thus, ALJs should not ignore medical reports simply because they predate the alleged onset of disability.") (citations omitted).

The Court does not find fault with the ALJ's decision not to consider evidence from Claimant's prior applications with regard to any of Claimant's alleged physical impairments. However, given the fact that the record in this case is relatively thin as to material addressing Claimant's level of adaptive functioning[1] and it appears that no mental evaluations of Claimant were completed with regard to the applications at issue in the instant appeal, the Court cannot reconcile the ALJ's decision not to consider any mental evaluations completed with regard to Claimant's prior

---

[1]For example, the record does not contain any school records for Claimant because the facilities in which they were stored were destroyed in September 1999 as a result of flooding during Hurricane Floyd. (R. 329.)

13

applications. In particular, the Court is troubled by the fact that the ALJ completely failed to mention Dr. English's 2004 diagnosis of Claimant as not only mildly mentally retarded but as someone falling into the low end of the spectrum of that diagnosis. Considering Dr. English's diagnosis of Claimant as mildly mentally retarded would not have amounted to a constructive reopening of any of Claimant's earlier applications because Claimant's alleged onset date for the instant application was subsequent to the filing dates of all of his prior applications. In addition, the Court is troubled by the ALJ's failure to acknowledge the fact that Claimant had indicated to Dr. English that he had been in special education classes or discuss, beyond the briefest of mentions, the fact that Claimant is apparently almost entirely unable to read and write.

The Court does recognize that the ALJ may have simply chosen to credit other evidence in the record with regard to Claimant's level of adaptive functioning. *See, e.g., Weaver v. Astrue*, No. 1:04CV1068, 2010 WL 1947216 (M.D.N.C. May 13, 2010) (holding that ALJ was entitled to give more weight to a medical expert's opinion in concluding that the claimant was of borderline intelligence than the opinions of two consulting psychologists who had indicated that the claimant was mildly mentally retarded). For example, a second DDS evaluation was performed by Dr. Gary Bachara, Ph.D. on March 7, 2007, in which Dr. Bachara noted Dr. English's 2004 diagnosis but instead opined as follows: "I would estimate his intelligence based on previous testing, etc., to be in a borderline range. I know he scored in the 50s, but he seems to be brighter than he comes across on formal testing, probably because of his lack of education. (R. 374.) However, given the ALJ's failure to discuss *any* mental evaluation evidence from any of Claimant's prior applications, on this record the Court cannot conclude that the ALJ considered *any* significant evidence of Claimant's level of adaptive functioning. *See DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983) ("It may

14

be . . . that the ALJ considered all of these factors and proposed to [her]self cogent reasons for disregarding them. However, on this record, we cannot so determine.").

In addition, the Court notes that the ALJ may have relied on inappropriate facts in support of her conclusion that Claimant did not meet Listing 12.05B. The ALJ reasoned that Claimant did not suffer from deficits in adaptive functioning because he, despite his low IQ, was able to live independently, perform chores, pay bills, work, and maintain a family. (R. 91.) However, "the fact an individual is able to work, complete household chores, and raise a family is not inconsistent with mild mental retardation." *Radford v. Astrue*, No. 5:08-CV-00421-FL, 2009 WL 1675958, at *6 (E.D.N.C. Jun. 10, 2009). Therefore, because the ALJ relied almost exclusively on the fact that Claimant had worked and performed other tasks in the past in finding that he did not meet Listing 12.05B, the Court finds that the ALJ appears to have placed improper weight on this type of evidence and failed to consider the possibility that Claimant might have met the diagnostic definition of mental retardation in spite of his history of functionality. Finally, the Court notes that, "in the absence of any evidence of a change in a claimant's intelligence functioning, it must be assumed that the claimant's IQ ha[s] remained relatively constant. . . . and the evidence that [a claimant] could barely read or write [i]s "a clear 'manifestation' of mental retardation occurring before age twenty-two." *Luckey v. U.S. Dept. of Health & Human Services*, 890 F.2d 666, 668-69 (4th Cir. 1989) (citations omitted).

In sum, the Court finds that the ALJ did not properly analyze all of the relevant evidence in reaching the conclusion that Claimant did not satisfy the diagnostic definition of mental retardation. Therefore, the Court finds that the ALJ's decision is not supported by substantial evidence and that

15

the case should be remanded in order to allow the Commissioner to properly address whether Claimant has satisfied the diagnostic definition of mental retardation, as required by Listing 12.05B.

### ii. The Commissioner's proffered case, *Hancock*, does not dictate a different result.

In arguing that the ALJ's decision that Claimant did not meet the diagnostic definition of mental retardation, as required by Listing 12.05B, is supported by substantial evidence, the Commissioner relies almost exclusively on the recent Fourth Circuit case of *Hancock v. Astrue*, 667 F.3d 470 (4th Cir. 2012), for the proposition that an ALJ's finding that a claimant does not have any *current* deficits in adaptive functioning is sufficient to preclude a finding that a claimant has satisfied the diagnostic definition of mental retardation, as required by Listing 12.05B. However, the Court finds that *Hancock* does not dictate a different result because the instant case is distinguishable from *Hancock* on its facts and that, in any case, the Commissioner's proposition may rely on dicta contained in *Hancock*.

In *Hancock*, the Fourth Circuit first addressed the issue of whether the claimant had satisfied the level of severity requirement at issue in that case under Listing 12.05C.[2] The claimant in *Hancock* had undergone an IQ test ordered by the ALJ and the examiner had found her to have a verbal IQ of 66, a performance IQ of 67 and a full scale IQ of 63 along with a diagnosis of mild mental retardation, but the examiner did not attest to the validity of the tests or opine that the claimant had given her best efforts. *Hancock*, 667 F.3d at 473-74. Accordingly, the ALJ had given the IQ results little weight and found that the claimant had not established the level of severity

---

[2]Though Listing 12.05C technically has a third requirement, that the claimant show that (s)he has a "physical or other mental impairment imposing an additional and significant work-related limitation of function," that requirement was uncontested in *Hancock* and, accordingly, as in the instant case, the only issues presented were the claimant's ability to satisfy the diagnostic definition of mental retardation and her ability to show the requisite IQ score to satisfy the level of severity requirement. *See* 20 C.F.R. § 404, Subpart P, App. 1, §12.05.

16

requirement of Listing 12.05C. *Id.* After some discussion, the Fourth Circuit upheld the ALJ's decision by joining several other Circuits in allowing an ALJ to discredit the only IQ score in the record on the basis of other contradicting evidence. *Id.* at 474-75.

Only after holding that the ALJ in *Hancock* had not erred in finding that the claimant had failed to meet the level of severity requirement of Listing 12.05C by showing the requisite IQ score did the Fourth Circuit address the issue of whether the claimant had satisfied the diagnostic definition of mental retardation. At the outset of its discussion on that subject, the Fourth Circuit stated as follows:

> As previously noted, Hancock can prevail only if she establishes that the ALJ erred in his analysis of Prong 1 and Prong 2. Therefore, even if the ALJ's finding concerning Prong 2 of Listing 12.05C did not rest on substantial evidence, we would still be required to affirm the ALJ's decision if his finding with regard to Prong 1 was based on substantial evidence. The ALJ found no deficits in adaptive functioning generally and also found that no deficiency manifested itself before the age of 22. Either finding alone, if supported by substantial evidence, would be sufficient to support the conclusion that Hancock did not satisfy Prong 1.

*Id.* at 475. The Fourth Circuit went on to find that the ALJ's decision that the claimant had failed to show either that she suffered from deficits in adaptive functioning generally or that she suffered from deficits which had manifested themselves before the age of 22 was supported by substantial evidence, and ultimately upheld the ALJ's decision to decline to award benefits. *Id.* at 475-76.

### (1) The instant case is distinguishable from *Hancock* on its facts.

The Court recognizes that several other district courts have chosen to interpret *Hancock* in a manner similar to that employed by the Commissioner here.[3] However, even assuming without

---

[3]*See, e.g., Guiton v. Astrue,* 2012 WL 1267856 (M.D.N.C. Apr. 16, 2012); *Hawley v. Astrue,* 2012 WL 1268475 (M.D.N.C. Apr. 16, 2012); *Nelson v. Astrue,* 2012 WL 373364 (M.D.N.C. Feb. 3, 2012).

17

deciding that the Commissioner's proposition–that *Hancock* establishes that an ALJ may find that a claimant has failed to establish that (s)he meets the diagnostic definition of mental retardation, as required by Listing 12.05B, if the ALJ finds that the claimant has no *current* deficits in adaptive functioning–is correct, the instant case is distinguishable from *Hancock* on its facts.

In *Hancock*, the claimant had worked as a battery assembler and a drop clipper, had the ability to shop, pay bills, and make change, took care of three small grandchildren at a level of care that satisfied the Department of Social Services, did the majority of her household's chores, was attending school to obtain a GED, and did puzzles for entertainment. 667 F.3d at 475-76. The Fourth Circuit found that this was sufficient to support the ALJ's finding that the claimant had no deficits in adaptive functioning generally, despite the claimant's arguments that the ALJ did not sufficiently consider conflicting evidence in making such a decision. *Id.* at 476.

Here, Claimant has a full scale IQ score of 52, is illiterate, has indicated that he was in special education classes, and was diagnosed by a doctor to be mildly mentally retarded. The Court finds that Claimant's characteristics are less in line with those of the claimant in *Hancock* and more in line with the characteristics of claimants that courts have found to meet the diagnostic definition of mental retardation. For example, this Court has held that an ALJ's finding that a claimant's deficits in adaptive functioning did not manifest before the age of 22 which was based on regular school attendance until the age of 18 and a "C" average in high school, was not supported by substantial evidence where, for example, the claimant had a full scale I.Q. of 52, could only read and perform arithmetic on a second grade level and spell on a first grade level, and was found by a doctor to meet the definition of mental retardation. *Watson v. Astrue*, 729 F. Supp. 2d 786, 788-89 (E.D.N.C. 2010) (Boyle, J.); *see also, e.g., Holtsclaw v. Astrue*, 1:10CV199, 2011 WL 6935499 (W.D.N.C. Dec. 30,

2011) (holding that, contrary to the ALJ's assertion, the claimant's training and work history did not offer substantial evidence of adaptive functioning where the claimant had a full scale IQ score of 59, was illiterate, and had a history of special education). As a result, the Court finds that the instant case is distinguishable from *Hancock* on its facts.

### (2) The Commissioner's proposition may rely on dicta contained in *Hancock*.

Notwithstanding the fact that the instant case is distinguishable from *Hancock* on its facts, the Court also finds it appropriate to note that the Commissioner's proposition may rely on dicta contained in *Hancock*. The Court does agree with the Commissioner that the Fourth Circuit appears to have implicitly condoned the ALJ's reasoning, at least in part, by noting that it was required to affirm the ALJ's decision if there was substantial evidence to support either his finding that the claimant suffered from no deficits in adaptive functioning generally or that she suffered from no deficits in adaptive functioning which had manifested themselves before the age of 22. *See Hancock*, 667 F.3d at 475. However, because the Fourth Circuit in *Hancock* had already found that the claimant had failed to establish that she met the level of severity requirement of Listing 12.05C, the Fourth Circuit's entire discussion on the issue of whether the claimant had established that she satisfied the diagnostic definition of mental retardation was not strictly necessary to the outcome of the case and appears to have been dicta.

In addition, even assuming, *arguendo*, that *Hancock* conclusively establishes that an ALJ may find that a claimant does not satisfy the diagnostic definition of mental retardation by finding that (s)he does not have any current deficits in adaptive functioning, the Court notes that it is further troubled by the fact that the ALJ here did not state that she was making any such finding, choosing

19

instead to state that she had concluded that the record did not establish deficits in adaptive functioning prior to the age of 22. Furthermore, also of concern to the Court is the fact that the ALJ's decision predated *Hancock* by almost two years and that, as a result, it is not clear whether the ALJ could even have known, based on the previous case law, that the logic the Commissioner suggests she must have employed would ever be accepted practice in this Circuit.

## CONCLUSION

In sum, it is not evident from the ALJ's decision whether the ALJ properly analyzed all of the relevant evidence in considering whether Claimant had satisfied the diagnostic definition of mental retardation. The ALJ did use the appropriate language in concluding that Claimant did not have "deficits in adaptive functioning prior to the age of 22." (R. 91.) However, particularly given errors such as the ALJ's failure to mention Dr. English's diagnosis of Claimant as mildly retarded, the Court cannot say with certainty that the ALJ's decision was supported by substantial evidence. In addition, the Court finds that the instant case is distinguishable from the Commissioner's proffered case, *Hancock v. Astrue*, 667 F.3d 470 (4th Cir. 2012), on its facts and that the Commissioner's proposition that a claimant's lack of any *current* deficits in adaptive functioning is sufficient to preclude a finding that the claimant has satisfied the diagnostic definition of mental retardation, as required by Listing 12.05B, may rely on dicta contained in *Hancock*.

Accordingly, for the foregoing reasons, the undersigned **RECOMMENDS** that Claimant's motion for judgment on the pleadings [DE-38] be **GRANTED,** that the Commissioner's motion for judgment on the pleadings [DE-43] be **DENIED,** and that the case be remanded to the Commissioner for further proceedings consistent with this Memorandum and Recommendation.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 29ᵀᴴ day of June, 2012.

DAVID W. DANIEL
UNITED STATES MAGISTRATE JUDGE